IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

CINDY L. COLEMAN                    )
                                    )
                                    )
        v.                          )        Case No. 3:05-0389
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security[1]  )


To: The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff does not meet one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4, and could perform work during the relevant time period that resulted in only occasional public contact, did not involve exposure to heights or moving machinery, and did not require driving, is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the record (Docket Entry No. 13) should be denied.

_____

[1] Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of Social Security pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

1

# I. INTRODUCTION

The plaintiff filed applications for DIB and SSI on September 9, 2002, alleging disability due to "nerves and stomach," with a date of onset on July 2, 2002. (Tr. 54, 69.)  The plaintiff also subsequently alleged disability due to seizures. (Tr. 118, 402.)  Her applications for DIB and SSI were denied initially and upon reconsideration. (Tr. 25-28, 31-32.)  A hearing was held before Administrative Law Judge ("ALJ") Donald E. Garrison on May 20, 2004.[2] (Tr. 388-425.)  The ALJ delivered an unfavorable decision on October 27, 2004 (Tr. 10-19), and the plaintiff petitioned for review of that decision before the Appeals Council. (Tr. 8.)  On May 24, 2005, the Appeals Council denied the plaintiff's request for review (Tr. 5-7), and the ALJ's decision became the final decision of the Commissioner.

# II. BACKGROUND

The plaintiff was born on December 1, 1961, and was 40 years old as of July 2, 2002, her alleged onset date. (Tr. 53.)  She completed high school and two years of correspondence Bible College. (Tr. 75, 395.)  The plaintiff's past jobs include employment as a truck stop manager, nursing home assistant, assembler, and restaurant cook/manager. (Tr. 84-91, 392-94.)

## A.  Chronological Background: Procedural Developments and Medical Records

On July 2, 2002, the plaintiff went to the Conway Regional Medical Center Emergency Room complaining of abdominal cramping and nausea. (Tr. 154.)  The plaintiff was diagnosed with

---

[2] The plaintiff signed a waiver of her right to representation and proceeded with the hearing without counsel. (Tr. 52.)

Case 3:05-cv-00389   Document 18   Filed 12/02/09   Page 2 of 25 PageID #: 43

abdominal pain that was not considered to be "emergent" and encouraged to visit a local doctor. (Tr. 155.) She presented to Dr. John Smith on July 5, 2002, and he reported that all of her lab work was normal and prescribed Zoloft to help decrease her stress level. (Tr. 166-71.)

On July 11, 2002, the plaintiff returned to Conway Regional Medical Center's Emergency Room with complaints of headaches and nausea. (Tr. 151.) She was diagnosed with a headache and was prescribed Demerol,[3] Phenergan,[4] and Droperidol.[4] (Tr. 150-52.) On July 16, 2002, the plaintiff returned to Dr. Smith and he reported that her physical examination was "absolutely normal." (Tr. 164-65.)

The plaintiff presented to Dr. Robert Ladd on September 6, 1998, and was diagnosed with headache and hypertension. (Tr. 255.) Thereafter, the plaintiff reported to Dr. Ladd on nearly a monthly basis and he repeatedly diagnosed her with headaches. (Tr. 212-67.) He frequently prescribed Phenergan and Nubain[5] to her. *Id.* On November 13, 2002, the plaintiff related to Dr. Ladd that she had suffered a nervous breakdown in July of 2002, and that she "wanted

---

[3] According to WebMD, Demerol is a narcotic medication similar to morhpine that is used to treat moderate to severe pain.

[4] According to WebMD, Phenergan and Droperidol are used to treat nausea and vomiting.

[5] Nubain is prescribed for the treatment of moderate to severe pain. Saunders Pharmaceutical Word Book 503 (2009) ("Saunders").

3

something for her nerves." (Tr. 215.)  Dr. Ladd diagnosed her with insomnia, anxiety, and depression, and prescribed Restoril,[6] Remeron,[7] Xanax,[8] and Reglan.[9] *Id.*

On January 9, 2003, Tennessee Disability Determination Services ("DDS") consulting psychologist Dr. Jeri Lee examined the plaintiff. (Tr. 172.)  The plaintiff reported that she had experienced a nervous breakdown in July of 2002, but that she had not received psychiatric or mental health treatment. (Tr. 173, 176.)  Dr. Lee noted that the plaintiff's daily activities included housework, cooking, washing laundry, shopping for groceries, and completing various tasks. (Tr. 174.)  Dr. Lee opined that the plaintiff's attention and concentration were intact and that her ability to understand, remember, and socially interact were not impaired. (Tr. 173, 175.)  He diagnosed the plaintiff with malingering,[10] ruled-out dependent personality disorder, and reported that she feigned memory loss. (Tr. 176.)  He assigned her a Global Assessment of Functioning ("GAF") score of 75.[11] *Id.*

---

[6] Accoding to WebMD, Restoril is a short-term treatment for patients having trouble falling asleep.

[7] Remeron is prescribed to treat major depressive disorder. Physicians Desk Reference 2924 (63rd ed. 2009) ("PDR").

[8] Xanax is prescribed to treat panic disorders and agoraphobia. Saunders at 768.

[9] Reglan is used to treat certain symptoms of nausea and vomiting. *Id.* at 607.

[10] Malingering is defined as the fraudulent exaggeration of symptoms of an illness or injury, with the intentions of a consciously desired outcome. Dorland's Illustrated Medical Dictionary 1091 (30th ed. 2003) ("Dorland's").

[11] A GAF score of 71-80 falls within the range of "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors; no more than slight impairment in social, occupational, or school functioning." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR").

On January 14, 2003, Dr. Frank Edwards, a consultating DDS physician, completed a Psychiatric Review Technique Form ("PRTF") on the plaintiff. (Tr. 177.) Dr. Edwards opined that the plaintiff exhibited dependent personality traits but that her impairment was not severe. (Tr. 177, 184.) He reported that the plaintiff's activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace were all mildly restricted. (Tr. 187.) Dr. Edwards also noted that the plaintiff did not suffer from episodes of decompensation and that her medical records failed to support her alleged nervous breakdown. (Tr. 187, 189.) On March 4, 2003, the plaintiff presented to Dr. William Gailmard and he diagnosed her with nausea and referred her for a brain MRI.[12] (Tr. 270.) On March 12, 2003, Dr. John Bartek conducted an MRI of the plaintiff's brain and it displayed normal patterns with "[n]o abnormal mass effect or area of altered signal intensity." (Tr. 271.)

On April 30, 2003, Dr. Frank Kupstas, a consultating DDS physician, completed a PRTF on the plaintiff and found that she had "[n]o medically determinable impairment." (Tr. 275.) Based on the plaintiff's medical records and past diagnoses, Dr. Kupstas found her to be malingering, with no functional limitations. (Tr. 287.) On the same day, consultating DDS physician Dr. H.T. Lavely opined that the plaintiff's physical impairments were "not severe, singly or combined." (Tr. 289.)

On August 7, 2003, the plaintiff reported to Dr. Ladd that she began having seizures the previous week. (Tr. 320.) Dr. Ladd examined her seven times between August and December of 2003. (Tr. 302-20.) He diagnosed her with psychomotor seizures,[13] depression, anxiety, headaches,

---

[12] Dr. Gailmard examined the plaintiff again on March 10, 2003, and March 14, 2003, but his medical reports from these two dates are largely illegible. (Tr. 268-69.)

[13] Psychomotor seizures, also known as psychomotor epilepsy, are epileptic seizures associated with disease of the temporal lobe and characterized by variable degrees of impaired

dizziness, abdominal pain, and insomnia, and he prescribed Dilantin[14] for her seizures. (Tr. 307.)

On August 20, 2003, the plaintiff complained that the Dilantin was not controlling her seizures and

reported having four seizures the previous day. (Tr. 319.) Dr. Ladd added Phenobarbital[15] to the

plaintiff's prescribed medications. *Id.* On September 4, 2003, the plaintiff complained that

Phenobarbital made her slur her speech and feel lethargic. (Tr. 318.) Dr. Ladd discontinued the

plaintiff's Phenobarbital prescription and increased her dosage of Dilantin. *Id.*

On September 8, 2003, the plaintiff was admitted to Tennessee Christian Medical Center

after complaining of "Dilantin toxicity" and having seizures ten times a day. (Tr. 305.) Dr. Ladd

reported that he had seen the plaintiff's seizures and described them as being

> psychomotor in nature. No foaming at the mouth, no incontinence, just some
> throwing of her hands, groaning, and her eyes are open, no tonic-clonic[16]
> movement. No Jacksonian[17] type movement. They last longer than 1 minute,
> patient does talk, she has somewhat slurred speech but then when she kind of forgets
> to do that she can talk normally.

*Id.* The plaintiff was discharged from Tennessee Christian Medical Center on September 9, 2003,

and Dr. Ladd reiterated that the plaintiff's "presumed seizure" did not appear to be an actual seizure,

---

consciousness. Dorland's at 628, 1540.

[14] According to WebMd, Dilantin prevents seizures by "reducing activity in certain areas of the brain."

[15] According to WebMd, Phenobarbital is used to control certain types of seizure problems.

[16] Clonic-tonic seizures are defined as "grand mal epilepsy, consisting of a loss of consciousness and generalized tonic convulsions followed by clonic convulsions." Dorland's at 1676.

[17] Jacksonian epilepsy is characterized by rapid unilateral muscle contraction and relaxation that begins in one group of muscles and systematically spreads to adjacent muscle groups. *Id.* at 628.

6

namely Jacksonian, clonic-tonic, or grand mal.[18] (Tr. 303.)  He opined that the plaintiff merely groaned and clutched her stomach, with her eyes open; was able to talk to him for over three minutes; and had slurred speech, except "when she forgot to slur her speech." *Id.*   Dr. Ladd indicated that aside from the plaintiff's abnormal Dilantin level, her "labs" were completely normal and that a CT scan of her head was normal. (Tr. 303, 310.)  He also concluded that the plaintiff had severe psychiatric problems, but noted that she refused to make an appointment with a mental health clinic. (Tr. 303.)

The plaintiff returned to Dr. Ladd for follow-up examinations and prescription refills in October, November, and December of 2003. (Tr. 315-17.)  On January 21, 2004, Dr. Ladd wrote a letter to Representative Bart Gordon, stating that the plaintiff appeared to have seizure episodes, but noted that she had not yet been evaluated by a neurologist. (Tr. 314.)  He recommended further testing by a neurologist "to determine the extent of her disability, if any." *Id.*

On January 14, 2004, the plaintiff presented to Dr. Jawaid Ahsan, a neurologist and movement disorder specialist, with complaints of seizures. (Tr. 334.)  Dr. Ahsan noted that the plaintiff was taking Depakote[19] and Dilantin. *Id.*  Upon examination, he diagnosed the plaintiff with symptoms that were consistent with essential tremor,[20] blepharospasm,[21] migraine headaches, and

---

[18] Grand mal epilepsy consists of a sudden loss of consciousness followed by "generalized convulsions." *Id.*

[19] Depakote is prescribed for the treatment of multiple types of seizures and for the prevention of migraine headaches. PDR at 424.

[20] Essential tremors are involuntary trembling episodes "aggravated by emotional factors" and "accentuated by volitional movement." Dorland's at 1940.

[21] Blepharospasm is a tonic spasm of the oculi muscle producing virtually complete closure of the eyelids. *Id.* at 227.

7

psychogenic seizures.[22] (Tr. 336.)  Dr. Ahsan prescribed Relpax,[23] Depakote, Dilantin, and Zoloft[24]

for the plaintiff, and he ordered an electroencephalogram ("EEG")[25] and MRI of her brain. (Tr. 332, 336.)

On January 22, 2004, the plaintiff underwent a brain MRI at Sumner Regional Medical Center and the results were unremarkable. (Tr. 338.)  On January 29, 2004, an EEG revealed no abnormalities. (Tr. 333.)  On March 21, 2004, Dr. Ahsan completed a Medical Source Statement of Ability to Do Work-Related Activities ("Medical Source Statement") on the plaintiff and opined that the plaintiff could occasionally lift/carry 100 pounds or more, frequently lift/carry 50 pounds, stand/walk approximately six hours in an eight hour workday, and periodically alternate between sitting and standing. (Tr. 327-28.)  He determined that the plaintiff's ability to climb, reach, handle, finger, and feel was occasionally limited. (Tr. 328-29.)  Dr. Ahsan also noted that the plaintiff should be limited in her exposure to temperature extremes, hazards, fumes, odors, chemicals, and gases. (Tr. 329-30.)

On February 3, 2004, Dr. Gailmard completed a Medical Source Statement on the plaintiff and opined that she was limited to occasional climbing, balancing, kneeling, crouching, crawling,

---

[22] Psychogenic seizures are also known as pseudoseizures. Dorland's at 1676.  A Pseudoseizure is an "attack resembling an epileptic seizure but having purely psychological causes; it lacks the electroencephalographic characteristics of epilepsy and the patient may be able to stop it by an act of will." *Id.* at 1536.

[23] Relpax is medication used to treat migraines. Saunders at 608.

[24] Zoloft is a selective serotonin reuptake inhibitor used to treat depression, panic attacks, and social anxiety disorder. *Id.* at 779.

[25] An EEG, or electroencephalogram, is a medical procedure that measures current generated from nerve cells in the brain that correlates with neurological conditions and is used to diagnose neurological problems. Dorland's at 596.

8

and stooping. (Tr. 293-96.)  Dr. Gailmard determined that the plaintiff did not have any manipulative, communicative, or environmental limitations. *Id.*

On February 25, 2004, the plaintiff presented to Dr. Myrna Kemp, Ph.D., claiming that she needed to get "a hold on [her] nerves." (Tr. 348-51.)  The plaintiff reported that she was not able to be in crowded or noisy places, and indicated that she still suffered from "seizure shakes." (Tr. 348.) Dr. Kemp diagnosed the plaintiff with "post traumatic stress disorder[,] chronic with delayed onset" and noted that she suffered from "seizures (by history)." (Tr. 351.)  She assigned the plaintiff a GAF score of 55.[26] *Id.*  On April 7, 2004, the plaintiff returned to Dr. Kemp for a therapy session. (Tr. 346.)  The plaintiff reported that she wanted to work but could not due to her seizures and expressed anger toward her recent ex-husband. *Id.*  The plaintiff had another therapy session with Dr. Kemp on May 11, 2004, and although she appeared angry during the session, she refused to try any of the anger coping strategies suggested by Dr. Kemp. (Tr. 344.)  The record indicates that the plaintiff cancelled therapy appointments with Dr. Kemp in March, April, and May of 2004. (Tr. 343-51.)

On March 17, 2004, the plaintiff presented to neurologist Dr. Wiaam Falouji with complaints of seizures and headaches. (Tr. 364-67.)  Dr. Falouji noted that the plaintiff was "well-appearing" but depressed, moved with difficulty, and exhibited both recent and remote memory impairment. (Tr. 366.)  Dr. Falouji indicated that laboratory tests showed that the plaintiff had Depakote and Dilantin in her blood stream, and increased the dosage of the plaintiff's Depakote prescription. (Tr. 367.)  Dr. Falouji ordered an eight hour EEG for the plaintiff and instructed her not to drive due

---

[26] A GAF score of 51-60 falls within the range of "[m]oderate symptoms [or] moderate difficulty in social occupational, or school functioning." DSM-IV-TR at 34.

to her reported seizures. *Id.* On April 20, 2004, Dr. Falouji conducted the eight hour EEG on the plaintiff and stated that

> [t]his is an abnormal 8-hour video EEG recorded during awake, drowsy and asleep. The patient had two episodes of body arching and jerking with correlating EEG abnormality. She did have occasional episodes of spike and wave activity, generalized at times prominent on the left. Despite the patient's reporting daily intractable seizures, the EEG does not correlate with her symptoms. There was no sub clinical seizure activity or clinical seizure activity to suggest status epilepticus. The patient does have pseudo seizures[27] in addition to real seizure activity, which is well controlled on Depakote.

(Tr. 359.) On May 5, 2004, the plaintiff returned to Dr. Falouji and reported that her condition had improved since taking Depakote but that she was still experiencing seizures. (Tr. 360-63.) Dr. Falouji reduced the plaintiff's dosage of Dilantin and prescribed Lamictal.[28] (Tr. 362.)

On July 23, 2004, consulting psychiatrist Dr. James McFerrin examined the plaintiff and opined that her judgment and insight were poor, and noted that she made a "poor attempt" to answer his questions but was oriented to person and place. (Tr. 370-71.) Dr. McFerrin diagnosed the plaintiff with "[s]omatization[29] disorder with malingering; personality disorder NOS;[30] and undocumented seizure disorder or pseudoseizures." (Tr. 371.) He assigned the plaintiff a GAF score of 55. *Id.* Dr. McFerrin also completed a mental Medical Source Statement on the plaintiff and

---

[27] *See supra* n.22.

[28] Lamictal is "prescribed to control partial seizures in people with epilepsy. It is used in combination with other antiepileptic medications or as a replacement for a medication such as Tegretol, Dilantin, phenobarbital, or Mysoline." PDR at 734.

[29] Somatization refers to the conversion of mental experiences into bodily symptoms. Dorland's at 1721.

[30] Personality Disorder NOS, referring to "not otherwise specified," occurs in patients with a pattern of exhibiting behavior that resembles a general personality disorder but does not meet the full criteria to be diagnosed with any specific disorder. DSM-IV-TR at 729.

10

found that her ability to understand, remember, and carry out instructions was not affected by her impairment. (Tr. 373.)  He further opined that the plaintiff was moderately limited in her ability to interact with the public and slightly limited in her ability to interact with supervisors and co-workers. (Tr. 374.)  Dr. McFerrin also noted that the plaintiff was slightly limited in her ability to deal with work pressures and changes, and that she alleged seizure activity that affected her driving ability and "work efforts." *Id.*

### B.  Hearing Testimony: The Plaintiff, a Witness, and the Vocational Expert

At the hearing, the plaintiff, her roommate, Betty Light, and a Vocational Expert ("VE"), Dr. Gordon Doss, testified. (Tr. 388.)  Although informed of her right to counsel, the plaintiff waived her right to representation and proceeded without an attorney. (Tr. 390.)

The plaintiff testified that she graduated from high school and took two years of course work at a correspondence Bible College. (Tr. 395.)  She reported that she knows how to read and write and that she has a driver's license, but that her doctors do not allow her to drive. *Id.*  The plaintiff stated that she has received training as a nursing technician but that she has not been involved in any vocational rehabilitation programs. (Tr. 396.)  The plaintiff reported that she lives with her friend, Betty Light, and occasionally stays with her children. *Id.*  She testified that she has not worked or attempted to work since July of 2002, when she was employed at a truck stop, because she "just got sick." (Tr. 397.)

When asked about her counseling history, the plaintiff testified that she went to approximately four appointments at Valley Ridge Mental Health Center. (Tr. 397-98.)  She reported that Dr. Ladd and Dr. Falouji prescribed medications for her nerves but that the medication did not

11

help. (Tr. 398.)  The plaintiff complained that her nerves make her "jump at noises" and interfere with her daily life activities. (Tr. 399.)  She reported that she separated from her husband in July of 2002, and has faced difficult family issues, all of which contributed to her worsening nervous condition. (Tr. 399-402.)

The plaintiff testified that she began experiencing seizures in the early 1990's and was prescribed Dilantin. (Tr. 403.)  She reported that she stopped taking Dilantin when she became pregnant with her daughter because of the possible side effects of the medication on her pregnancy. (Tr. 404.)  The plaintiff testified that after her initial seizures, she did not have any episodes for a long period of time. *Id.*  The plaintiff testified that she experienced some seizures at work and that they became much more frequent once she stopped working. (Tr. 403.) She reported that she was taking four different seizure medications at the time of the hearing, and that she has been taking medication for her epilepsy since July of 2002. (Tr. 404.)

The plaintiff described her seizures as beginning with a headache, followed by her losing consciousness. (Tr. 402.)  Although she has not kept a journal or calendar of her seizures, the plaintiff testified that her friend, Ms. Light, has witnessed several of her episodes and described them as "bad." (Tr. 403, 405.)  The plaintiff reported that the seizures have caused her to fall, break teeth, and chew on her tongue. (Tr. 408.)  The plaintiff complained that upon regaining consciousness following a seizure she feels exhausted and unfocused, and usually has to go to the bathroom. (Tr. 407-08.)  The plaintiff stated that although her seizure episodes do not occur daily, the episodes do occur at least once a week. (Tr. 404.)

The plaintiff testified that she also experiences headaches that can last up to a "couple days." (Tr. 406.)  She reported that she takes Vicodin for her headaches and Depakote, Lamictal, and

12

Dilantin for her seizures. (Tr. 404-06.) She complained that Depakote causes her to have tremors but claimed that she takes her medications as prescribed. (Tr. 407.) The plaintiff also related that she watches some television and reads the Bible with a magnifying glass. (Tr. 409.) She complained that she had poor vision and that she wears sunglasses because light hurts her eyes. *Id.* The plaintiff reported that she cooks with help from Ms. Light and washes dishes, but that she is not able to perform yard work. (Tr. 410.) The plaintiff testified that she has experienced seizures while attending church, explaining that one of the episodes occurred while she was singing. (Tr. 410-11.) She related that if she feels well enough, she helps Ms. Light clean the church. (Tr. 411.) The plaintiff also testified that she occasionally visits her grandmother and accompanies Ms. Light to the grocery store. (Tr. 411-12.)

Ms. Light testified that the plaintiff had been living with her "off and on for about a year" and that she assists the plaintiff by driving her around and making sure that she takes her medications. (Tr. 413-15.) Ms. Light reported that although she did not keep a record of the plaintiff's seizure activity, she had witnessed the plaintiff experience as many as ten episodes in one day. (Tr. 414.) She explained that during a seizure, the plaintiff "draws up in a knot," shakes, and makes choking sounds. *Id.* Ms. Light testified that the plaintiff has had seizures in church, at her home, and in the car, and that the plaintiff's seizures occur more frequently when she gets upset or is overly tired. (Tr. 415.) She reported that during a seizure, the plaintiff sometimes loses consciousness and usually wakes up unfocused and confused. (Tr. 414-15.)

The VE testified that the plaintiff's past work as a truck stop manager was medium and skilled, as a certified nursing assistant was medium and semiskilled, as a restaurant manager was light and skilled, and as a restaurant cook was medium and skilled. (Tr. 392-93.) After the VE

13

questioned the plaintiff about her job at a factory, he labeled her job there as an assembler and classified it as light and unskilled. (Tr. 393-94.)  The ALJ then asked the VE to consider whether a person of the plaintiff's age, work experience, and education would be able to perform the plaintiff's past relevant work, with no exposure to heights, moving machinery, driving, or the public. (Tr. 417.)  The VE opined that a person with such limitations could not perform the plaintiff's past relevant work but could engage in work as an entry level file clerk, a general office clerk, a mail room clerk, a domestic housekeeper, and a companion for a "bed-bound person." (Tr. 417-18.)  The VE also opined that a person with a GAF score of either 55 or 75 could perform all of the jobs that he listed in his answer to the ALJ's hypothetical. (Tr. 418.)

The ALJ then asked the VE to consider a hypothetical person who is limited to jobs that did not requiring extended periods of attention or concentration, and jobs without a production rate pace or changing work procedures. (Tr. 419.)  The ALJ described that individual as being able to make judgments about only simple work-related decisions and able to understand, remember, and carry out only short and simple instructions. *Id.*  The VE opined that all of the jobs previously mentioned would be available, with the exception of general office clerk, if the office is a fast-paced environment. *Id.*  The VE testified that the rate of absenteeism tolerated for the listed jobs was typically no more than three days per month. (Tr. 420.)

The ALJ asked the VE to consider the impact of the plaintiff's testimony, assuming that it was credible, on available jobs. *Id.*  The VE testified that although he would need to consult her neurologist or psychiatrist, the plaintiff's testimony did not support any disabling physical limitations, although the frequency of her seizures might interfere with some work. (Tr. 420-21.)  When asked to consider Dr. Ahsan's and Dr. Gailmard's medical assessments, the VE opined that

14

neither assessment would significantly limit the number of available jobs that he had listed. (Tr. 421.)

### III.  THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on October 27, 2004. (Tr. 10-19.)  Based on the record, the ALJ made the following findings:

1.  The insured status requirements of the act were met as of the alleged onset date.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset date.

3.  The claimant's seizure and/or pseudo seizure disorder; somatization disorder with malingering; and personality disorder are considered "severe" based on the requirements in the Regulations 20 CFR 404.1520(c) and 416.920(b).

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The claimant has the following residual functional capacity: avoid all jobs with exposure to heights, moving machinery; no driving; and occasional contact with the public.

7.  The claimant is unable to perform any of her past relevant work. 20 CFR 404.1565 and 416.965.

8.  The claimant is a "younger individual" with a high school education. 20 CFR 404.1563 and 416.963; 20 CFR 404.1564 and 416.964.

9.  Transferability of skills is not material in this case. 20 CFR 404.1568 and 416.968.

15

10.    Although the claimant's exertional limitations do not allow her to perform the full range of work, using Section 200.00(e) as a guide for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as: file clerk (2,393); mail clerk (2,955); housekeeper (3,898); and companion/sitter (850-1,000) in the Tennessee regional economy.

11.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision. 20 CFR 404.1520(g) and 416.920(g).

(Tr. 18.)


# IV.  DISCUSSION

## A.  Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*). A

16

reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding

17

appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b).  The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d) and 416.920(d)).  The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.*  The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989).  If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national

18

economy. *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines "grid" as a means for the Commissioner of carrying his burden under appropriate circumstances).  It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391.  Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform, she is not disabled.[31]  *Id.  See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4).  *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).


### B.  The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's case at step five of the five-step process. (Tr. 18.)  At step one, the ALJ found that the plaintiff successfully demonstrated that she had not engaged in substantial gainful activity since July 2, 2002, the alleged onset date of disability. *Id.*

---

[31] This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if she applied.  *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

At step two, the ALJ found that the plaintiff suffered from the severe impairments of seizure and/or pseudo seizure disorder, somatization disorder with malingering, and personality disorder. *Id.* At step three, the ALJ determined that the plaintiff's impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. *Id.* At step four, the ALJ found that the plaintiff was precluded from performing her past relevant work. At step five, the ALJ determined that although the plaintiff must avoid all jobs that require driving and exposure to heights, moving machinery, and occasional public contact, he concluded that the plaintiff could perform a significant number of jobs in the regional economy. *Id.*

The effect of this decision was to preclude the plaintiff from DIB and SSI benefits and to find her not disabled, as defined in the Social Security Act, at any time after July 2, 2002, through the date of the decision.

### C. The Plaintiff's Assertion of Error

The plaintiff contends that the ALJ erred in concluding that the she did not meet or medically equal one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1, specifically Listings 11.02 and 11.03. Docket Entry No. 13, at 8-10. She alleges that the record medical evidence demonstrates that she has satisfied the criteria under 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 11.02 and 11.03 for convulsive and nonconvulsive epilepsy. *Id.*

As noted in *Little v. Astrue*, "'the burden of proof lies with the [plaintiff] at steps one through four of the [sequential disability benefits analysis],' including proving presumptive disability by meeting or exceeding a Medical Listing at step three." 2008 WL 3849937, at *4 (E.D.Ky. Aug. 15, 2008) (quoting *Her*, 203 F.3d at 391). Thus, the plaintiff "'bears the burden of proof at Step Three

20

to demonstrate that [she] has or equals an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1.'" *Little*, 2008 WL 3849937, at *4 (quoting *Arnold v. Comm'r of Soc. Sec.*, 238 F.3d 419 (table), 2000 WL 1909386, at *2 (6th Cir. Dec. 27, 2000)).  The plaintiff's impairment must meet all of the listing's specified medical criteria and "[a]n impairment that meets only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530-532, 110 S.Ct. 885, 107 L.Ed.2d 967(1990).  If the plaintiff does demonstrate that her impairment meets or equals a listed impairment, then the ALJ "'must find the [plaintiff] disabled.'" Little, 2008 WL 3849937, at *4 (quoting *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir.1987)).

For the plaintiff to meet Lisitng11.02, convulsive epilepsy with major motor seizures, and 11.03, nonconvulsive epilepsy with minor motor seizures, she is required to provide "[a]t least one detailed description of a typical seizure" including an account of "the presence or absence of aura, tongue bites, sphincter control, injuries associated with the attack, and postictal phenomena." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00A.  This description should be reported by a physician, or substantiated by testimony of a person other than the plaintiff "if professional observation is not available." *Id.*  Specifically, Listing 11.02 requires the plaintiff to show that her seizures occurred "more frequently than once a month," and that if the episodes took place during the day, the episodes consisted of a loss of consciousness and convulsions or if the episodes  took place at night, the residual affect of those episodes "interfere[d] significantly with [her] activity during the day." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.02.  Listing 11.03 requires the plaintiff to show that her seizures occurred "more frequently than once weekly" and must be accompanied by an "alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional

21

behavior or significant interference with activity during the day." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.03. Both Listings 11.02 and 11.03 also require the seizures to occur in spite of at least three months of prescribed treatment. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 11.02, 11.03.

The plaintiff testified that her seizure episodes occur at least once a week, and begin with a headache and result in her losing consciousness. (Tr. 402, 404.) She reported that her seizures have caused her to fall, break teeth, and chew her tongue, and that upon regaining consciousness she feels exhausted and unfocused. ( Tr. 407-08.) Ms. Light, the plaintiff's friend, testified that she has witnessed several of the plaintiff's episodes and that the plaintiff has experienced up to ten episodes in one day. (Tr. 414.) She described the plaintiff as making choking sounds, shaking, and "draw[ing] up in a knot" when the plaintiff has a seizure and stated that the seizures are more likely to occur when the plaintiff is upset or overly tired. (Tr. 414-15.)

It is quite clear from the plaintiff's testimony, Ms. Light's testimony, and the record evidence that the plaintiff experiences some manifestation of seizure activity. However, the record evidence does not show that the plaintiff's episodes can be characterized as convulsive and nonconvulsive epilepsy under Listings 11.02 and 11.03. Dr. Ladd first diagnosed the plaintiff with psychomotor seizures on August 7, 2003, and prescribed both Dilantin and Phenobarbital for her. (Tr. 307, 319.) Upon witnessing one of the plaintiff's episodes, Dr. Ladd stated that the plaintiff's "presumed seizure" did not appear to be an actual seizure and that she merely groaned and clutched her stomach, with her eyes open; spoke with him for over three minutes; and had slurred speech, except "when she forgot to slur her speech." (Tr. 303.) Dr. Ladd opined that the plaintiff had severe psychiatric problems (Tr. 303) and that although she appeared to have seizure episodes, he recommended that she receive further testing by a neurologist. (Tr. 314.)

22

Dr. Ahsan, a neurologist and movement disorder specialist, examined the plaintiff on January 14, 2004, and diagnosed her with psychogenic seizures. (Tr. 336.) According to *Dorland's Illustrated Medical Dictionary*, psychogenic seizures are also called pseudoseizures and are defined as being "attack[s] resembling an epileptic seizure but having purely psychological causes; [they] lack the electroencephalographic characteristics of epilepsy and the patient may be able to stop [them] by an act of will."[32] Dr. Ahsan also conducted an EEG on the plaintiff and found no abnormalities. (Tr. 333.) Nearly three months later a second neurologist, Dr. Falouji, conducted an eight hour EEG on the plaintiff and noted that although the plaintiff exhibited "two episodes of body arching and jerking with correlating EEG abnormality," the EEG did not support the plaintiff's claim of having "daily intractable seizures." (Tr. 359.) Dr. Falouji also opined that the plaintiff's EEG did not reveal any "sub clinical seizure activity or clinical seizure activity to suggest status epilepticus," and he concluded that she had pseudoseizures "in addition to real seizure activity." *Id.* Dr. Falouji stated the plaintiff's seizure activity would be "well controlled on Depakote." *Id.*

The plaintiff asserts that although the "ALJ may have been concerned with the possibility of the psychogenic nature of some of the seizures or Dr. Falouji's description of them as 'pseudo seizures in addition to real seizure activity'" (Docket Entry No. 13, at 10), the introductory language to the neurological listing section provides that the "degree of impairment" does not depend upon the etiology of the epileptic seizure, but rather upon the "type, frequency, duration, and sequelae" of the seizure." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00A. Yet, it is this exact introductory language which undercuts the plaintiff's position because the language pertains to epileptic seizures, with which the plaintiff has not been specifically diagnosed. Dr. Ladd initially diagnosed the

---

[32] *See supra* n.22.

plaintiff's seizure episodes as psychomotor, but after witnessing one of her episodes it is clear that he was unsure of his original diagnosis and decided to refer the plaintiff to a neurologist. (Tr. 303.) Further, both neurologists that examined the plaintiff, Dr. Ahsan and Dr. Falouji, diagnosed the plaintiff's episodes as psychogenic seizures or pseudoseizures. (Tr. 336, 359.) Dr. Falouji even noted that the plaintiff's seizure activity did not "suggest status epilepticus." (Tr. 359.) Given that the plaintiff's seizure episodes were not determined to be epileptic in nature, the ALJ was effectively precluded from applying Listings 11.02 and 11.03 since those listings deal with disability requirements specific to convulsive and nonconvulsive epilepsy. Thus, the ALJ's conclusion that the plaintiff did not meet or equal a listed impairment is supported by substantial evidence in the record.

Case 3:05-cv-00389   Document 18   Filed 12/02/09   Page 24 of 25 PageID #: 65

## VI. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 13) be DENIED and that the Commissioner's decision be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*. 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge

25